613 S.E.2d 808

**Elizabeth MURPHY, Appellant,**

**v.**

**JEFFERSON PILOT COMMUNICATIONS COMPANY, WCSC, Inc., d/b/a WCSC Channel 5, and Donald M. Feldman, Defendants, of whom Jefferson Pilot Communications Company and WCSC, Inc., d/b/a WCSC Channel 5 are, Respondents.**

**Christopher Murphy, Appellant,**

**v.**

**Jefferson Pilot Communications Company, WCSC, Inc., d/b/a WCSC Channel 5, and Donald M. Feldman, Defendants, of whom, Jefferson Pilot Communications Company and WCSC, Inc., d/b/a WCSC Channel 5 are, Respondents.**

No. 3988.

Court of Appeals of South Carolina.

Heard March 10, 2005.

Decided May 2, 2005.

Rehearing Denied June 22, 2005.

---

454

John E. Parker and Ronnie L. Crosby, both of Hampton, for Appellants.

John J. Kerr, of Charleston, for Respondents.

STILWELL, J.

Elizabeth Murphy filed an action against Jefferson Pilot Communications Company (Jefferson Pilot), WCSC, Inc. d/b/a WCSC Channel 5 (WCSC), and Donald M. Feldman, alleging, *inter alia,* defamation and intentional infliction of emotional distress. Elizabeth's husband, Christopher Murphy, filed a

companion claim alleging loss of consortium. The trial court directed verdicts in favor of WCSC and Jefferson Pilot. The jury returned a verdict against Feldman, awarding the Murphys substantial actual and punitive damages. The Murphys appeal. We affirm in part, reverse in part, and remand.

## FACTS

Donald Feldman served as "Assistant VP News" for Jefferson Pilot and was the news director of WCSC, a Charleston television station and Jefferson Pilot subsidiary. He reported directly to the general manager of Jefferson Pilot. Feldman met Sandra Senn, a local attorney, and convinced her to become a voluntary panelist on a political talk show broadcast by WCSC entitled "Carolina Gang." Senn, a former partner in the Stuckey Law Firm, had recently started her own firm. Elizabeth's father, James Stuckey, was the senior partner of the Stuckey Law Firm. Senn and the firm were involved in a dispute regarding business issues relating to Senn's departure from the firm, and Senn mentioned her frustrations springing from the dispute in casual conversations with Feldman.

On July 23, 1999, Feldman telephoned Senn and said that he had just arrived in Atlanta on a flight from Charleston. Feldman told Senn that Elizabeth was on his flight and, while very intoxicated, made slanderous remarks about Senn and WCSC.

A couple of days later, Feldman electronically mailed Senn stating:

> I have decided to take an ACTIVE roll [sic] in dealing with this woman. I have come up with my own plan to deal with her. . . . After thinking about it, I am determined not to let this woman attempt to destroy your reputation and my plan will scare the crap out of her. It was selfish of me to stay out of it.

Later the same week, Feldman told Senn he sent a letter (the Letter) to Elizabeth via courier. Feldman provided Senn with a copy of the Letter. The Letter was written on WCSC stationery and stated:

Dear Ms. Stuckey: [1]

---

1. Elizabeth is referred to in the record as both Elizabeth Murphy and Elizabeth Stuckey. We refer to her as Elizabeth.

After what I felt were disturbing and potentially Liable [sic] Statements aboard Delta Fight 852 from Charleston to Atlanta on July 23, 1999.[sic] There are several issues I am compelled to discuss with you.

Your unsubstantiated comments against Jefferson–Pilot Communications, WCSC News, Sandy Senn and Me are at the least tasteless and could force our company to take legal action against you and your law firm.

As you so clearly stated, Ms. Senn is a WCSC Air Personality. Therefore, WCSC has a moral as well as a financial interest in protecting her reputation and that of our News Department and its' [sic] programs. It is one thing to criticize an air personalities [sic] delivery, but it is quite another to loudly and publicly discuss their bedroom habits and personal disputes between you, your Law Firm, and her. I am also deeply disturbed that you would question my hiring practices and the motives behind them. I have been in Television News Management for thirty years and maintain WCSC's news as the highest rated and most respected in the market.

As a result, I have instructed a member of our staff to contact Delta Airlines to obtain the passenger manifest and the flight attendant service log for the flight we were on. Atlanta Passenger Service Agent Heath Hamrick will also be contacted. As you recall, he was the individual who repeatedly told you to keep your voice down after our late arrival in Atlanta.

I intent [sic] to use the passenger service manifest to determine which passengers, if any, heard your comments. I will then contact Frank Magid Associates, our research firm, and ask them to interview any Charleston area passengers to see if your statements will affect their perceptions and viewing habits of Channel Five and Carolina Gang. They will also ask if the perceptions of Ms. Senn have changed.

The flight attendant service log will be used to determine how many bottles [sic] alcohol you were served on the flight.

Once I have this information, I intend to turn to our legal department. They will advise me whether to tell Ms. Senn of the incident and whether our company should take legal

action against you and your law firm. If you care to discuss this incident further, please contact me at 402–5740.

In the end, this matter could become far more embarrassing for you and your law firm than for Jefferson Pilot Communications, Ms. Senn, or me.

I would hope we can resolve this matter quickly before there is any more damage to the reputations of anyone.

Sincerely,

Donald M. Feldman

Vice–President/News Director

Subsequently, Feldman told Senn that Elizabeth came to WCSC on two occasions to discuss entering into a civil agreement to refrain from any further defamation of Senn. Senn testified she assisted Feldman in the preparation of the agreement, but never saw a signed copy. At that time, Feldman told Senn that Elizabeth was on the plane with a man who was not her husband. On another occasion, Feldman told Senn he had the passenger manifest and the drink log from the flight.

In late September of 1999, Senn gave a copy of the Letter to Dale DuTremble, the attorney representing her in the dispute with the Stuckey Law Firm. Senn told DuTremble she wanted the airplane defamation incident resolved along with her other dispute with the Stuckey Law Firm. DuTremble met with Feldman at WCSC to discuss the Letter. At the meeting, Feldman repeated all the allegations he claimed occurred on the airplane and reiterated that Elizabeth was traveling with a man other than her husband. Feldman told DuTremble he had the passenger manifest and the drink log, but would not reveal them as he was protecting his source at Delta.

DuTremble informed Susan Wall, the attorney representing the Stuckey Law Firm in its dispute with Senn, of Elizabeth's alleged conduct on the airplane. Wall called Elizabeth. Elizabeth denied having any knowledge of the airplane incident and, subsequent to her conversation with Wall, realized she was attending a soccer game and birthday party in Charleston when the airplane incident allegedly occurred. Elizabeth did not see the Letter, supposedly sent to her in July, until November.

Elizabeth showed the Letter to Stuckey, who called Tom Waring, an attorney who represented WCSC. On November 16, Waring talked with Elizabeth and Stuckey and then contacted Rita O'Neill, WCSC's general manager. O'Neill called Feldman to find out what was going on. Feldman told her about the alleged incident on the airplane and stated Elizabeth attacked Senn and the "Carolina Gang." Feldman also told O'Neill that the former station manager, Chuck Wing, gave permission to write the letter, and that Wing edited the letter. Feldman indicated that Dan McAlister, general counsel for Jefferson Pilot, probably saw the Letter.

The next day, Waring went to WCSC and met with Feldman and O'Neill. Feldman produced a copy of the Letter and stated that he had disposed of the passenger manifest and drink log. Feldman told O'Neill and Waring it was his duty to respond to Elizabeth to protect the station, and he had permission from Wing to write the Letter.

DuTremble testified that beginning in either late 1999 or early 2000, Feldman's story began to unravel. All parties finally realized that Elizabeth was not on the flight as Feldman alleged, and obviously Feldman never had the manifest or log as he originally insisted. In November of 2000, Feldman was arrested on embezzlement charges and, at the time of trial, was incarcerated in federal prison. After his arrest, it became clear the entire incident involving Elizabeth never occurred and was entirely fabricated by Feldman.

As a result of Feldman's defamatory allegations, Elizabeth sought psychiatric treatment and was diagnosed with a major depressive episode, severe major depression, and severe anxiety. Elizabeth took a medical leave from the practice of law.

In 2001, the Murphys filed suit against Jefferson Pilot, WCSC, and Feldman. The Murphys alleged Feldman made slanderous statements about Elizabeth, which he published in the Letter and to Senn. The Murphys alleged Feldman's actions were performed within the scope of his employment with WCSC and as an agent for WCSC and Jefferson Pilot. In addition, they alleged Feldman's conduct amounted to intentional infliction of emotional distress.

The action was tried before a jury over an eight-day period. The trial court denied the Murphys' motions for directed

verdicts on liability, and granted the directed verdict motions of WCSC and Jefferson Pilot based on "public policy." The trial court then submitted the case to the jury on only the issue of damages as to Feldman. The jury returned a verdict for Elizabeth of $3,009,268 in actual damages and $3,000,000 in punitive damages. The jury returned a verdict in favor of Christopher Murphy for $3,000,000 in actual damages due to loss of consortium.

The Murphys filed a motion to alter or amend the judgment pursuant to Rule 59(e), SCRCP, and in the alternative a motion for a new trial, arguing the trial court erred in directing verdicts in favor of Jefferson Pilot and WCSC and in denying the Murphys' motion for directed verdicts. The trial court denied the post-trial motions. The Murphys appeal.

## LAW/ANALYSIS

### STANDARD OF REVIEW

■ In ruling on a motion for directed verdict, the court must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party. *Gilliland v. Doe*, 357 S.C. 197, 199, 592 S.E.2d 626, 627 (2004). The court must determine the elements of the action alleged and whether any evidence existed on each element. *First State Sav. & Loan v. Phelps*, 299 S.C. 441, 446, 385 S.E.2d 821, 824 (1989). An appellate court must apply the same standard when reviewing the trial judge's decision on such motion. *See Weir v. Citicorp Nat'l Servs., Inc.*, 312 S.C. 511, 514–15, 435 S.E.2d 864, 867 (1993) (stating standard for appellate court).

### I. Directed Verdicts

■ The Murphys argue the trial court erred in directing verdicts for WCSC and Jefferson Pilot and erred by refusing to direct verdicts in favor of the Murphys. We find the trial court erred in granting WCSC and Jefferson Pilot directed verdicts but did not err in denying the Murphys' motion for directed verdicts.

The trial judge explained he had studied the law and general principles of vicarious liability but found this case "bizarre" and "unique" and "in the written history of the law

there has never been another case like it." Without considering the evidence presented as to the vicarious liability of WCSC and Jefferson Pilot, the court concluded:

To extend vicarious liability to the facts of this case would be beyond reason. If there is any principle guiding the common law, it is reason. There is no reason or public policy to extend the principle of vicarious liability to the facts of this case. I grant the motion for a directed verdict on behalf of WCSC [and Jefferson Pilot].

We find the trial court erred as a matter of law by granting WCSC and Jefferson Pilot directed verdicts based on public policy without considering the elements of the actions alleged and the evidence introduced at trial. *See Phelps*, 299 S.C. at 446, 385 S.E.2d at 824 (in reviewing the granting of a directed verdict, the court should determine the elements of the action alleged and whether any evidence existed on each element).

 Although we concur with the trial court that the facts of this case are bizarre, we find the law governing vicarious liability should have been considered in reviewing the motions for directed verdicts. Clearly, there is legal authority that "a principal may be held liable for defamatory statements made by an agent acting within the scope of his employment or within the scope of his apparent authority." *Murray v. Holnam, Inc.*, 344 S.C. 129, 139, 542 S.E.2d 743, 748 (Ct.App.2001). "Under fundamental principles of South Carolina law, a master is liable for and is charged with knowledge of the acts and conducts of his servants operating within the scope of their employment." *Gathers v. Harris Teeter Supermarket, Inc.*, 282 S.C. 220, 227, 317 S.E.2d 748, 753 (Ct.App.1984). "If the servant is doing some act in furtherance of the master's business, he will be regarded as acting within the scope of his employment, although he may exceed his authority." *Crittenden v. Thompson–Walker Co.*, 288 S.C. 112, 115, 341 S.E.2d 385, 387 (Ct.App.1986) (citations omitted). If there is doubt as to whether the servant was acting within the scope of his employment, the doubt will be resolved against the master at least to the extent of requiring the question to go to the jury. *Id.* at 116, 341 S.E.2d at 387.

 "An agency relationship may be established by evidence of actual or apparent authority." *Charleston, S.C.*

*Registry for Golf & Tourism, Inc. v. Young Clement Rivers & Tisdale, LLP,* 359 S.C. 635, 642, 598 S.E.2d 717, 721 (Ct.App. 2004). "The elements which must be proven to establish apparent agency are: (1) that the purported principal consciously or impliedly represented another to be his agent; (2) that there was a reliance upon the representation; and (3) that there was a change of position to the relying party's detriment." *Graves v. Serbin Farms, Inc.,* 306 S.C. 60, 63, 409 S.E.2d 769, 771 (1991). An agency relationship need not be express, but may be implied from the conduct of the parties. *Gathers,* 282 S.C. at 226, 317 S.E.2d at 752.

 There was conflicting evidence at trial regarding Feldman's actual or apparent authority and scope of employment. Neither this court nor the trial court has authority to decide credibility issues or to resolve conflicts in the testimony and evidence when considering a motion for directed verdict. *Collins v. Doe,* 343 S.C. 119, 125, 539 S.E.2d 62, 64 (Ct.App. 2000), *rev'd on other grounds,* 352 S.C. 462, 574 S.E.2d 739 (2002). The issues of agency relationship and scope of employment are generally for the jury. *Crittenden,* 288 S.C. at 115, 341 S.E.2d at 387; *Gathers,* 282 S.C. at 226, 317 S.E.2d at 752.

As to Feldman's authority and scope of employment, O'Neill and Waring testified that Feldman told them Wing, the station manager at that time, gave Feldman the authority to write the Letter. Feldman also told O'Neill that Dan McAlister, counsel for Jefferson Pilot, likely previewed the Letter. The Letter was written on WCSC stationery and in it, Feldman purported to be motivated by a desire to protect Senn, the station, and Jefferson Pilot.

There was evidence in the record that Feldman had broad authority to speak on behalf of WCSC, enter contracts on behalf of WCSC, respond to viewer complaints, and defend the station in letters to newspaper editors or reporters. However, there was conflicting evidence that Feldman did not have authority. Senn testified that Feldman repeatedly told her that the matter was personal and not a WCSC matter. Wing denied he ever reviewed or edited the Letter.

Both Senn and DuTremble testified they believed Feldman had authority to act on WCSC's behalf. Senn believed Feld-

man's story regarding the incident on the plane and believed Feldman had the authority to write the Letter. "I didn't ever see him write letters, but I assume he would have the authority. He had the letterhead, but I—you know, I don't know." Senn also testified after she received a copy of the letter she gave it to DuTremble. She then told DuTremble that she heard for years that Elizabeth talked badly about her, "But then I finally had something in writing on Channel 5 letterhead. So I gave it to my lawyer."

DuTremble's testimony also indicates he believed Feldman had authority to make the defamatory statements. DuTremble testified in camera:[2]

When I went to see Don Feldman, I went to see him as a potential witness. I did not have in my mind anything to do with his position as news director.

However, when you read [the Letter and the civil agreement], together, it's obvious that Don Feldman is acting in his position as news director, as an employee for the station, because to give effect—

[The Court]: No question that's what his job was.

[DuTremble]: Exactly. To give effect to the civil agreement, he had to have that authority.

DuTremble later testified:

I mean, Don Feldman was—you know, he was a member of the community. He was—he was known in the community. He was news director, a person of some authority apparently. So he carried some indicia of reliability with him. . . .

Acting on this belief, DuTremble wrote the October 4, 1999 letter to Wall, Elizabeth's attorney.

We find the questions of agency and scope of employment were issues for the jury to decide. Therefore, the trial court did not err in denying the Murphy's motion for directed verdicts but erred in directing verdicts in favor of WCSC and Jefferson Pilot.

---

2. The trial court denied the Murphys' request to enter this testimony into evidence. However, the Murphys challenge the trial court's ruling in this appeal and we find the trial court erred in excluding this testimony.

## II. Ratification

 The Murphys also argue WCSC and Jefferson Pilot's ratification of Feldman's acts warranted submission of the case to the jury. We find this issue is not properly preserved for our review. In order for an issue to be preserved for appellate review, with few exceptions, it must be raised to and ruled upon by the trial judge. *Lucas v. Rawl Family Ltd. P'ship*, 359 S.C. 505, 511, 598 S.E.2d 712, 715 (2004). The Murphys did not assert the argument of ratification to the trial court or in their Rule 59(e) motion to alter or amend the judgment. Because the Murphys raised this argument for the first time on appeal, we find it is not properly preserved for our review.

## III. Admission of Evidence

 The Murphys argue the trial court erred in excluding the testimony of Dale DuTremble.[3] The decision whether or not to admit testimony into evidence is within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of that discretion. *Am. Fed. Bank v. Number One Main Joint Venture*, 321 S.C. 169, 174, 467 S.E.2d 439, 442 (1996).

The trial court found DuTremble's testimony related to Feldman's authority at the time he met with DuTremble and Senn rather than Feldman's authority at the time he wrote the Letter. The court found the testimony relevant, but the admission of the testimony would confuse the jury, outweighing its probative value. Accordingly, after consideration of Rules 701 and 403, SCRE, the trial court excluded the testimony.

Rule 701, SCRE, states:

If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which (a) are rationally based on the perception of the witness, (b) are helpful to a clear understanding of the witness' testimony or the determina-

---

3. We decline to address any other evidentiary issue on appeal. *See Dixon v. Ford*, 362 S.C. 614, 608 S.E.2d 879 (Ct.App.2005) (declining to address evidentiary issue in action remanded for new trial).

tion of a fact in issue, and (c) do not require special knowledge, skill, experience or training.

Rule 403, SCRE, provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

In this case, DuTremble was testifying as a fact witness. His testimony was relevant to his perceptions and helpful to a clear understanding of a fact in issue. We fail to see undue prejudice to the defendants. Accordingly, we find the trial court abused its discretion in excluding this portion of Du-Tremble's testimony.

## CONCLUSION

For the foregoing reasons, the matter is affirmed in part, reversed in part, and remanded for proceedings consistent with this opinion.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

GOOLSBY and HUFF, JJ., concur.